**REGIONAL PROPERTIES, INC., et al., Plaintiffs-Appellees, Cross-Appellants,**

v.

**FINANCIAL AND REAL ESTATE CONSULTING COMPANY, et al., Defendants-Appellants, Cross-Appellees.**

**No. 80–1779.**

United States Court of Appeals, Fifth Circuit.

June 3, 1982.

As Amended Aug. 27, 1982.

---

Denton & Generes, Carl A. Generes, John Alan Goren, Dallas, Tex., for defendants-appellants, cross-appellees.

Haynes & Boone, George W. Bramblett, Jr., Nina Cortell, Dallas, Tex., Schreeder, Wheeler & Flint, Charles L. Schreeder, III, Atlanta, Ga., for Regional Properties, Inc.

Before BROWN, COLEMAN and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Two real estate developers and their affiliated corporations entered into a number of agreements with a securities broker whereby the broker agreed to structure limited partnerships and market the limited partnership interests. The developers discovered that the broker had never registered as a broker-dealer with the SEC and had thus violated the Securities Exchange Act in selling the partnership interests, although the time when they learned of this is disputed. The major question presented is whether, under these circumstances, the developers were entitled to rescind their agreements with the broker under the contract-voiding provision contained in the Act. We hold that the developers were entitled to bring such an action and established a *prima facie* case for relief, but that the district court erred in failing to rule upon

the broker's asserted defenses. We, therefore, remand the case so that the district court may consider and rule upon these defenses.

## I. INTRODUCTION.

Paul E. Thomes and Jerry D. Shipley, who were real estate entrepreneurs, planned to acquire, develop, and operate certain residential and shopping center projects. In order to finance these projects, they wished to sell limited partnership interests in each. Thomes and Shipley, or one of their wholly owned corporations, Regional Properties, Inc., and Kingsley Creek, Inc., or some combination thereof, would be the general partners.

In 1974, Thomes and Shipley were introduced by an intermediary to David Goldner, who represented to them that he was a knowledgeable financial consultant, expert in the tax and legal aspects of limited partnerships and in federal and state securities law. Goldner, who conducted his operations through Financial and Real Estate Consulting Company, a New York partnership formed with his sister in 1971, further purported to be experienced in real estate syndications in particular and to have clients interested in making investments in limited partnerships.

In fact, Goldner was a former New York lawyer who had been disbarred. He had little experience in real estate matters or in the handling of limited partnerships. He was ignorant of federal securities law requirements for either private placements or public offerings of limited partnership interests. Finally, neither he nor his company, Financial, was registered as a broker or dealer in securities. None of these facts was disclosed by Goldner to either Thomes or Shipley.

Throughout 1974 and the first half of 1975, Thomes and Shipley planned and eventually developed four projects in association with Goldner: Kingsley Creek, Thousand Pines and Brooklake, all garden-type apartment complexes, and Montgomery Mall, a shopping center.[1] An examination of the evolution of the Kingsley Creek project illustrates the course of dealings and the agreements entered into between Thomes and Shipley and their corporations, and Goldner and his company.

Thus, on April 4, 1974, prior to the actual formation of the Kingsley Creek Limited Partnership, Thomes, Shipley, and Regional Properties, Inc., and Financial, represented by Goldner, signed an agreement relating to the development of what were called the Kingsley Creek Apartments. Although bearing the indicia of a technical hand in drafting, the agreement is unusual in structure. Basically, however, Financial agreed to structure the partnership and market the limited partnership interests therein in return for a fee to be paid by whoever was eventually named as the partnership's general partner.

They agreed that the partnership, when formed, would net $420,000 from the sale of its limited partnership interests. As in the agreements relating to the other projects, however, the gross offering price of the limited partnership interests was left unspecified. The amount raised in excess of $420,000 was to be the initial component of Financial's fee, to be paid, in the parties' words, "off the top."

The agreement also stipulated that the partnership was to be structured in such a way that the limited partners would be guaranteed a certain cash flow. Financial was obligated to place a portion of its "off the top" fee in escrow to guarantee these payments. If, however, Financial's escrowed funds were in fact used to make these guaranteed payments, the general partner would repay 50% of the funds so distributed within five days, or relinquish almost a third of its interest in the project to Financial.

The cash flow and distribution of profits in excess of the guaranteed payments to the limited partners were to be evenly divided between the limited partners and the gener-

---

1. Prior to trial, the parties settled their dispute with regard to Montgomery Mall. Therefore, no further mention of that project need be made.

al partner. As the second component of its fee, Financial was to receive an assignment of 30% of any such cash flow or profits thus accruing to the general partner.

After the signing of this agreement, the partnership was officially formed with Kingsley Creek, Inc., another of Thomes and Shipley's corporations, as the general partner. Goldner then advertised and tried to sell the limited partnership interests, but with little success until he engaged the assistance of a third party, Holt & Hartman, Inc., a registered broker-dealer. With this help, Goldner eventually sold the Kingsley interests for $735,000, thereby entitling Financial to $315,000 as the "off the top" component of its fee (*i.e.*, $735,000—$420,000). Financial paid Holt & Hartman $65,000 for its services and $8,100 in legal fees. By the time of trial, Financial had been paid $120,000 of its $315,000 fee, and the balance, $195,000, had been placed in escrow pursuant to the terms of the agreement as described above.

The structuring of the other two projects, Thousand Pines and Brooklake, was similar to that of Kingsley Creek. By the time of trial, Financial had been paid $175,000 of the $195,000 initial fee for the Thousand Pines project, and had incurred expenses in connection with that project of approximately $25,000. For the Brooklake project, Financial had been paid only $282,000 of the $846,000 initial fee, and had incurred expenses of approximately $200,000.

Shortly after their purported[2] initial discovery that neither Goldner nor his company, Financial, (hereinafter collectively referred to as "Financial") had ever registered with the Securities and Exchange Commission ("SEC") as a broker-dealer, as required by section 15(a)(1) of the Securities Exchange Act of 1934 ("Act"),[3] Thomes and Shipley and their affiliated corporations, Regional Properties, Inc., and Kingsley Creek, Inc., (hereinafter collectively referred to as "Regional"),[4] brought suit against Financial under section 29(b) of the Act.[5] Alleging its agreements with Financial to be "void" under that section, Regional sought to rescind those agreements, recover the sums it had already paid to Financial (less Financial's expenses and payments to third parties), and obtain the right to the funds Financial had placed in escrow. Regional subsequently amended its complaint to allege, *inter alia*, violations of section 10(b) of the Act[6] and breach of fiduciary duty. Financial answered these complaints by raising the affirmative defenses that the parties were *in pari delicto* and should be left as the court found them, estoppel, waiver, laches and ratification, and then,

2. *See* Part II. C. *infra.*

3. Section 15(a)(1) of the Act provides, in relevant part:

No broker or dealer (other than one whose business is exclusively intrastate) shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security . . . otherwise than on a national securities exchange, *unless such broker or dealer is registered in accordance with subsection (b) of this section.*

15 U.S.C. § 78*o*(a)(1) (emphasis added).

4. A fifth plaintiff, Regional Properties of New Mexico, Inc., another corporation wholly owned by Thomes and Shipley, had an interest in this case only insofar as it had been the nominee owner of the Montgomery Mall underlying real estate. As the dispute regarding that project was settled prior to trial, *see* note 1 *supra*, we need not concern ourselves further with this party.

5. Section 29(b) provides, in relevant part:

Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and *every contract* (including any contract for listing a security on an exchange) heretofore or hereafter made, *the performance of which involves the violation of*, or the continuance of any relationship or practice in violation of, *any provision of this title* or any rule or regulation thereunder, *shall be void (1) as regards the rights of any person who, in violation of any such provision,* rule, or regulation, *shall have* made or *engaged in the performance of any such contract*, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . .

15 U.S.C. § 78cc(b) (emphasis added).

6. *See* 15 U.S.C. § 78j(b).

with some inconsistency, counterclaimed for the amounts still due it under the agreements.

After a two-day trial to the court, the district judge found that Financial had been "engaged in the business of selling securities for the accounts of the limited partnerships," and had violated section 15(a)(1) of the Act[7] by doing so without being registered as a broker-dealer. The court held that Regional was entitled under section 29(b) to rescission of its agreements with Financial because their "performance . . . involve[d] the violation of . . . [a] provision of [the Act]." Section 29(b), 15 U.S.C. § 78cc(b); see note 5 supra. Concluding that fully restoring the parties to their status quo ante would be impossible, however, because Financial had already completed performance and the limited partnerships were already in operation, the district court ordered only that Financial have no further enforceable rights under the agreements or to its escrowed funds, but allowed Financial, "in compensation for its services," to retain the amounts it had already been paid. The court also held that there had been no section 10(b) violation by Financial,[8] but did not rule on Regional's breach of fiduciary duty claim. The district court also failed to mention the defenses raised by Financial except to state, "Regional did not know that Financial was not legally authorized to act as a broker/dealer" until after all the agreements had been executed and largely, if not completely, performed by Financial.

Financial appeals, contending that the district court erred in holding that Regional had "standing" to assert its section 29(b) claims, in otherwise holding that Regional had prevailed on those claims, and in failing to rule upon its asserted defenses. Financial also objects to the district court's award of rescission as being "inequitable." Regional cross-appeals, contending that the district court erred by allowing Financial to retain any payments under the contracts in excess of the amount of Financial's expenses and payments to third parties.

## II. Regional's Section 29(b) Claims.

Section 29(b) provides, "[e]very contract made in violation of any provision of [the Act] . . ., and every contract . . . the performance of which involves the violation of . . . any provision of [the Act] . . ., shall be void . . . as regards the rights of any person who, in violation of any such provision . . . shall have made or engaged in the performance of any such contract . . . ." Section 29(b), 15 U.S.C. § 78cc(b) (quoted in full at note 5, supra). Although it has been a part of the Act since its passage in 1934, it has been invoked infrequently. See Gruenbaum & Steinberg, Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened, 48 Geo.Wash.L.Rev. 1, 1–3 & n.5 (1979) [hereinafter cited as Viable Remedy]. It does not in terms give a party to a contract made in violation of the section a private cause of action to rescind the contract. If it authorizes such an action by implication, the following questions must also be addressed: (1) What are the elements of the cause of action? (2) What defenses, if any, are available against the claim? and (3) What relief is available to a successful claimant?

### A. Does Section 29(b) Provide for a Private Cause of Action?

Without expressly considering whether section 29(b) implies a private cause of action, courts have uniformly either held or assumed that such suits can be brought. In the only Fifth Circuit case interpreting section 29(b), *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir.), *cert. denied*, 393 U.S. 913, 89 S.Ct. 234, 240, 21 L.Ed.2d 198 (1968), the issuer of certain bonds sued a purchaser of the bonds under section 29(b) to have the contract of sale rescinded on the ground that the purchaser had violated the Act by not being a registered broker-dealer when it made the purchase. We prefaced our discussion of the points raised on appeal by

---

**7.** See note 3 supra.

**8.** Regional does not appeal this ruling.

stating that section 29(b) "contemplates civil suit for relief by way of rescission and damages ...." *Id.*, 391 F.2d at 362.[9] Therefore, at least since 1968, it has been the rule of this circuit that a private cause of action can be founded upon section 29(b).

Language in two subsequent Supreme Court decisions tends to affirm this view. In *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Court stated, in dicta, that the interests of the "innocent party" to a contract are protected by section 29(b)'s "giving him the right to rescind." *Id.*, 396 U.S. at 387–88, 90 S.Ct. at 623, 24 L.Ed.2d at 603 (dictum). More recently, in *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court was called upon to determine whether section 215(b) of the Investment Advisers Act,[10] which is nearly identical to section 29(b) of the (Securities Exchange) Act,[11] provides a private cause of action. In answering that question in the affirmative, the Court stated:

> By declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that § 215 could be raised defensively in private litigation to preclude the enforcement of an investment advisers contract.

But the legal consequences of voidness are typically not so limited. A person with the power to void a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid .... Moreover, the federal courts in general have viewed such language as implying an equitable cause of action for rescission or similar relief.

For these reasons we conclude that when Congress declared in § 215 that certain contracts are void, it intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission ..., and for restitution.

*Id.*, 444 U.S. at 17, 100 S.Ct. at 246–47, 62 L.Ed.2d at 153–54 (citations and footnote omitted). Therefore, based upon our (implicit) holding in *Eastside Church*, and the supporting language in *Mills* and holding in *TAMA*, it must be considered as settled that section 29(b), by implication, does provide a private, "equitable cause of action for rescission or similar relief." *TAMA, supra,* 444 U.S. at 17, 100 S.Ct. at 246, 62 L.Ed.2d at 153.

### B. The Elements of a Section 29(b) Cause of Action.

In *Eastside Church, supra,* we rejected the defendants' argument that a section

---

**9.** It is not now clear whether *damages* may be awarded in a suit brought under section 29(b). In *Moody v. Bache & Co.*, 570 F.2d 523 (5th Cir. 1978), we stated,

> Plaintiff's arguments with respect to Bache's brokerage duties rely chiefly on § 15(c)(1) of the ... Act, as applied under § 29(b) of the same act .... In view of our position that Bache was not a broker ..., we need not discuss this argument here, although we note that in this case, *where plaintiff essentially asks for a remedy comparable to money damages, the argument is highly questionable in light of the Supreme Court's discussion of § 29(b) in Mills v. Electric Auto-Lite Co.*

*Id.*, 570 F.2d at 527 n.6 (dictum) (emphasis added) (citations omitted). *See also Viable Remedy, supra,* 48 Geo.Wash.L.Rev. at 25–27. In any event, we need not decide that issue here because, although Regional originally asked for damages in addition to rescission, the district court awarded only the latter, and Regional has not appealed that decision.

**10.** Section 215(b) of the Investment Advisers Act provides, in relevant part:

> Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

15 U.S.C. § 80b–15(b).

**11.** *Compare* note 5, *supra, with* note 10, *supra.*

29(b) plaintiff must prove a causal connection between its harm and the defendants' violation of the Act.[12] The "Act," we said, "requires only that the [complainant] be in the class of persons the Act was designed to protect .... *[I]t is sufficient to show merely that the prohibited transactions occurred and that the [complainant was] in the protected class." Eastside Church, supra*, 391 F.2d at 362 (emphasis added). Although we did not define the phrase, "class of persons the Act was designed to protect," the plaintiff in *Eastside Church* was obviously a member of it as the issuer of the bonds that were sold under the contract.

We indicated that there was one other requirement, contractual privity. The issuer in *Eastside Church* had not dealt directly with the purchaser-defendant, but had instead delivered the bonds to its agent for their sale. When it was pointed out that the agent might have purchased for his own account some of the bonds he thus received before he in turn sold them to the purchaser-defendant, we held that the defendant was "liable only on those purchases which were made from [the agent] acting [as such] ... and not from [the agent] individually." *Eastside Church, supra*, 391 F.2d at 363.

■ To summarize, then, a person can avoid a contract under section 29(b) if he can show that (1) the contract involved a "prohibited transaction," (2) he is in contractual privity with the defendant, and (3) he is "in the class of persons the Act was designed to protect."

Before determining whether Regional satisfied these elements, we consider first Financial's arguments that dicta concerning section 29(b) in *Mills v. Electric Auto-Lite Co., supra*, must be deemed to have modified our holding in *Eastside Church*. The Court there said that the language of section 29(b)

> establishes that the guilty party is precluded from enforcing the contract against an *unwilling innocent party*, but it does not compel the conclusion that the contract is a nullity, creating no enforceable rights even in a party innocent of the violation. The lower federal courts have read § 29(b) ... as rendering the contract merely *voidable at the option of the innocent party* .... This interpretation is eminently sensible.

*Mills, supra*, 396 U.S. at 387–88, 90 S.Ct. at 623, 24 L.Ed.2d at 604 (dicta) (emphasis added) (citations and footnote omitted). On the other hand, we had previously said in *Eastside Church, supra*, that contracts running afoul of section 29(b) are "void *ab initio.*" *Id.*, 391 F.2d at 363. We agree with Financial that, to the extent our statement in *Eastside Church* could be construed as allowing a violator of the Act to rescind a contract, it is inconsistent with *Mills*.[13] This modification of *Eastside Church* does not, however, help Financial, because it was the party, if any, who violated the Act.

Financial also argues that the Court's statement that section 29(b) renders the contract voidable "*at the option of the innocent party,*" *Mills, supra*, 396 U.S. at 387, 90 S.Ct. at 623, 24 L.Ed.2d at 604 (dicta) (emphasis added), somehow erects a "standing" prescription requiring a section 29(b) plaintiff to show that he is an "innocent party" as a prerequisite to suit. While we do not think it is either correct or fruitful to couch

---

12. As noted above, *see* Part II. A. *supra*, the section 29(b) defendants in *Eastside Church* violated section 15(a)(1) of the Act by making purchases of securities while not being registered as a broker-dealer with the SEC. *See Eastside Church, supra*, 391 F.2d at 360–62. Their violation was therefore similar to the one here, where Financial was charged by Regional with violating section 15(a)(1) by not being registered when it sold the limited partnership interests.

13. As the authors of *Viable Remedy, supra*, have stated, it would be inconsistent with any conceivable purpose of section 29(b) "to permit culpable violators to impose the voidness provision of section 29(b) as a defense to an action brought by a victimized investor, or to authorize the violator through his own wrongdoing to initiate suit on voidness grounds because the contract was not to his liking ...." *Id.*, 48 Geo.Wash.L.Rev. at 8–9.

this issue in terms of "standing,"[14] we do think the statement demonstrates the Court's intention that a section 29(b) defendant at least be allowed to invoke the traditional equitable defenses, which we discuss in Part II. C., *infra*. Before defenses to an action are relevant, however, the plaintiff must first have proved its case. We, therefore, examine whether Regional did so.

■ Contractual privity, the first element of the cause of action, is established beyond dispute. In fact, Regional and Financial were the only parties to the contracts. Regional also satisfied the second element, proof that "prohibited transactions occurred." Section 29(b) does not render void only those contracts that "by their terms" violate the Act. *But see Drasner v. Thomson McKinnon Securities, Inc.*, 433 F.Supp. 485, 501–02 (S.D.N.Y.1977) (so holding).[15] If the Act were so limited, it would lead immediately to the inquiry, 'What would such a contract look like?' A statute that voided only contracts by which persons have agreed in express terms to violate the Act would be so narrow as to be a waste of the congressional time spent in its enactment.

If section 29(b) voids only those contracts "which by their terms" *necessarily* involve a violation of the Act in their making or performance, the section would have a somewhat broader scope. Nevertheless,

this interpretation involves reading the word, "necessarily," into the statute when it simply is not there. It also generates difficult problems of proof. Financial not only was not registered with the SEC, but also probably would not have been granted registration had it applied because Goldner was a disbarred lawyer and had recently signed a consent decree with New York authorities whereby he agreed not to market limited partnership interests in that state without first complying with all its applicable blue sky regulations. It would nonetheless be difficult to determine that the contract with Financial necessarily involved a statutory violation.

Interpreting section 29(b) to render voidable those contracts that are either illegal when made or as in fact performed not only avoids these problems but also, in our view, most nearly comports with the language used in section 29(b). *See* note 5 *supra; Viable Remedy, supra*, 48 Geo.Wash.L.Rev. at 20–24. Moreover, this interpretation is the one implicitly adopted by *Eastside Church*. There, we allowed a contract for the purchase of bonds, after it had already been performed, to be rescinded by the seller. There was nothing to suggest that the contract "by [its own] terms" violated the Act. We permitted it to be rescinded simply because the purchaser, in performing the contract, had in fact violated the Act by doing so without being registered as a broker-dealer. *Cf. Mills, supra*, 396 U.S. at 388

14. As Gruenbaum & Steinberg have stated, "Section 29(b) is directed ... at nullifying the rights of the violator, not at the standing of the complainant to assert the right to the remedy created by the section." *Viable Remedy, supra*, 48 Geo.Wash.L.Rev. at 33. The Supreme Court has held that "standing" exists if "the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise," and if "the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute ... in question." *Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184, 187 (1970).

More recently, the Court said, in *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355 (1975), that the essence of the question of standing "is whether the ... statutory provision on which the claim rests proper-

ly can be understood as granting persons in the plaintiff's position a right to judicial relief." Under this view, Regional certainly had "standing" to sue Financial under section 29(b) because, as we have just held, that section does by implication allow for the bringing of private actions, and, as is discussed immediately below, Regional established a *prima facie* case thereunder. *See generally* Currie, Misunderstanding Standing [1981] Sup.Ct.Rev. 41 (1981); *cf.* C. Wright, Law of Federal Courts § 13, at 43 (1976) ("The person suing for breach of contract or for a tort must satisfy the court that he has standing to bring such a suit, but in practice such suits are brought only by a person harmed by the supposed wrong, and his standing to sue is self-evident.").

15. *See also* cases cited in *Viable Remedy, supra*, 48 Geo.Wash.L.Rev. at 21 n.102.

n.11, 90 S.Ct. at 623 n.11, 24 L.Ed.2d at 604 n.11 (dicta) (proxies submitted in favor of merger could be rescinded, even though terms of merger were not themselves unlawful, if proxies had been solicited in a manner violative of the Act). We acknowledged that, from the standpoint of the broker, this was a "harsh" [16] result, but stated that this "seems to be what Congress intended." *Eastside Church, supra*, 391 F.2d at 362.

The situation here is in all essentials identical to that in *Eastside Church*. Regional sought to avoid certain contracts, perfectly lawful on their face, the performance of which by Financial resulted in a violation of the Act. That these contracts, under different circumstances, *could* have been performed without violating the Act is immaterial. Considering the language of section 29(b), our holding in *Eastside Church*, and the dicta in *Mills*, we conclude that Regional proved the existence of "prohibited transactions," *i.e.*, ones proscribed by section 29(b).

The final element of a section 29(b) cause of action under *Eastside Church* is proof that the complainant was a "member of the class of persons the Act was designed to protect." The statute does not in terms limit the class of persons who may invoke its contractual voidness provisions to investors. While the law was enacted to protect the public interest and the investor,[17] its protection extends beyond those who buy securities.

That statutes must be read in the light of their purpose is an admonition not only ancient but wise. That "The letter killeth and the spirit giveth life" [18] is not limited to hermeneutics but extends as well to the interpretation of congressional text. Yet we start with the objective reading for the Congress has many members and the President signs with yet another hand. If what is written is clear and its application leads to no absurd result, we should not seek to obfuscate the obvious.

Section 29(b) renders certain contracts void. It does not limit that invalidity to contracts between issuers and sellers or to those between issuers and investors. The contracts involved here were between the general partners and a partnership that held itself out to be a qualified broker. Neither any investor nor the issuer was privy to it. Yet, as we have just held, they were precisely the kind of contracts "performance of which involve[d] the violation of" a provision of the Act, specifically, section 15(a)(1). If a party to these contracts could not attack them, it would be yet more difficult to find reason to permit assault by the nonparty issuers and investors whom, according to Financial, the Act was designed to protect.

Moreover, we think that application of the letter of the statute in this case does further the Act's purposes. In *Eastside Church, supra*, we emphasized that section 15(a)(1)'s registration requirement

> is of the utmost importance in effecting the purposes of the Act. It is through the broker registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records.

---

**16.** Judge Friendly has gone so far as to characterize this interpretation as "Draconian." *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly, J., dissenting), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971). He suggested, without citing any legislative history or other support, that section 29(b) was merely a legislative direction to the courts to employ the common law principles of illegal bargain. *Id.*
In any event, we do not agree with Judge Friendly's statement that our interpretation of section 29(b) provides a "pat ... formula for solving every case in which a contract and a

violation concur." *Id.* Instead, under our interpretation, the violation, to trigger the application of the section, must have occurred in the making or performance of the contract sought to be rescinded.

**17.** *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213–14 (9th Cir. 1962); Section 15(c) of the Act, 15 U.S.C. § 78*o*(c); 1 Goldberg, Fraudulent Broker-Dealer Practices 8–10.

**18.** The Second Epistle of Paul to the Corinthians, iii, 6.

*Id.*, 391 F.2d at 362. As we have pointed out, Financial's fees were raised by the sale of the limited partnership interests, paid over to the general partner in the project, and then, in turn, paid by the general partner to Financial. Without splitting hairs over whether Regional, when it signed the subject contracts, could have been considered the "issuer" of the limited partnership interests, or an "investor" in the projects, we conclude that Regional was a "member of the class of persons the Act was designed to protect," and, therefore, satisfied the last of the elements of a section 29(b) action under *Eastside Church* as well as all the others.

C. The Defenses to a Section 29(b) Cause of Action.

■ Having thus decided that Regional did make out a *prima facie* case under section 29(b), we next must determine whether there exist defenses to such an action and, if so, whether Financial succeeded in proving any. Although the question of the availability of defenses to a section 29(b) action was not discussed in *Eastside Church*, we have no hesitation in holding that there are such defenses and that they, in fact, encompass all the traditional equitable defenses.

■ The starting points for our discussion are the propositions, too elementary to require citation, that, historically, a suit to void a contract sounded in equity, and that, in suits in equity, equitable defenses, such as laches, estoppel, etc., may be raised. While actions to void a securities broker's contract obviously stem from statute rather than a traditional equitable right, they are equitable in nature. The Ninth Circuit has stated in the leading case on this subject:

Since courts generally interpret statutes in the context of the common law and Congress has not specifically denied the availability of these defenses, we see no reason why the ordinary [equitable] defenses of estoppel and waiver should not be applicable.

*Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 214 (9th Cir. 1962). Though that court mentioned only the defenses of estoppel and waiver, because those were the only ones raised by the defendant, we see no reason why the same reasoning would not allow any of the equitable defenses to be pleaded and proved by a section 29(b) defendant.

While neither of the Supreme Court's discussions of section 29(b) or section 29(b)-type actions, in *Mills* and *TAMA*, can be said to contain unambiguous expressions of full support for this proposition, they both favor such a view. Thus, in *TAMA*, holding that a private cause of action can be brought under section 215(b) of the Investment Advisers Act, *see* Part II.A. *supra*, the Court noted with approval the "general" reading of section 29(b)-type provisions by the lower federal courts as "implying an *equitable* cause of action for rescission or similar relief." *TAMA, supra*, 444 U.S. at 17, 100 S.Ct. at 246, 62 L.Ed.2d at 153 (emphasis added). And in *Mills*, the Court specifically acknowledged the availability of at least one of the equitable defenses, that of *in pari delicto*, in a section 29(b) action, for it stated that a contract violating section 29(b) is "voidable at the option of the innocent party." *Mills, supra*, 396 U.S. at 387, 90 S.Ct. at 623, 24 L.Ed.2d at 604 (dicta) (emphasis added).

Therefore, because it would be anomolous to hold that, while one equitable defense is available, the others are not, we join with virtually all other courts that have decided this issue and hold that all equitable defenses are available in a section 29(b) cause of action. *See, e.g., Occidental Life Insurance Co. v. Pat Ryan & Assoc.*, 496 F.2d 1255, 1267–68 n.9 (4th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166, 1182 (8th Cir. 1972) (though confusing the concepts of a defense and a standing requirement). *But see Grove v. First National Bank of Herminie*, 489 F.2d 512, 516 (3d Cir. 1973).

■ Unfortunately, our holding does not dispose of this important part of the case. Although Financial raised a number of de-

fenses below, essentially revolving around two basic lines of argument, the district court failed to rule upon, or even mention, any of them. Because a determination of the validity of these defenses depends upon additional fact findings and interpretations of Texas law,[19] both of which can initially be made more easily by the district court than by us, we remand this case to the district court to rule expressly upon Financial's defensive contentions.

Financial founded its first set of defenses on the following set of allegations.[20] Shortly after Goldner and Thomes and Shipley agreed to do the first deal, Kingsley Creek, Goldner suggested that they retain a lawyer, Loren Weinstein, to do the legal work involved in setting up the limited partnership and other related matters. Weinstein was retained, and, according to Goldner, occupied at least the position of joint representative for both Regional and Financial. Goldner alleges that Regional paid at least a part of Weinstein's fees, and that Weinstein had at least twenty-five conferences with either Thomes or Shipley or both.

The relevance of this is that, as of mid-August 1974, at least three months prior to the offering of the Kingsley Creek interests, and before the signing of both the Thousand Pines and Brooklake agreements, Weinstein discovered that neither Goldner nor Financial was registered as a broker-dealer with the SEC. Financial argues that, because Weinstein was Regional's attorney, Weinstein's knowledge must be imputed to Regional, and that, therefore, for the purpose of ruling upon Financial's defenses, particularly laches, Regional must be found to have had knowledge of Financial's status, not shortly before suit was filed in 1976, but nearly two years earlier.

On remand, the district court shall determine: (1) whether Weinstein was representing Regional (though not necessarily only Regional) in his work on the Kingsley Creek project; (2) if so, whether Weinstein's knowledge should, under Texas law, be imputed to Regional; and (3) if so, whether Financial therefore succeeded, under Texas law, in establishing any of its claimed defenses to Regional's section 29(b) claims.

Financial's second basic set of defenses was founded upon certain Texas state court pleadings filed by Regional both before and after it filed this action in federal court. According to Financial, Regional had been sued in state court by a broker-dealer for commissions earned in connection with the placement of certain of the limited partnership interests. Regional, in turn, filed a third-party complaint against Financial, one week before it filed its federal action, alleging that, under the agreements here sought to be rescinded, Financial was responsible for the payment of any such fees. Regional reaffirmed this position in the state court action more than one year later, although it eventually non-suited Financial.

Financial argues that these actions by Regional constituted either a waiver of its right to rescind the agreements or a ratification of them. Because we are remanding this case to the district court to rule upon Financial's defenses based upon attorney Weinstein's knowledge, we also direct the court to rule upon this second set of defenses as well.

D. The Relief Available in a Section 29(b) Cause of Action.

After concluding that Regional had prevailed on its section 29(b) claims, the district court ordered that Financial have no

---

**19.** In view of the parties' agreement that state law applies to any equitable defenses, we have applied Texas law principles. We note that, if federal common law were applicable, a federal court would look to state law for guidance. *See, e.g., Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 918, 1 L.Ed.2d 972, 980–81 (1957). However, we intimate no opinion concerning whether state law or federal common law should apply in future cases. We reserve that decision for a case in which the issue is raised and briefed.

**20.** We intimate no view on the truth of these allegations. That will be for the district court to decide.

further enforceable rights under the agreements, but allowed it to retain the sums already directly paid by Regional, and directed that the portion of Financial's fees held in escrow be released to Regional so that the limited partners could receive their guaranteed payments without loss to Regional. In essence, then, the court ordered partial rescission of the agreements and partial restitution of the consideration paid (*i.e.*, the return of Financial's escrowed funds to Regional).

Both parties assail this award. Regional contends that it should have been awarded full restitution, *i.e.*, the return of all its payments to Financial less Financial's out-of-pocket expenses and payments to third parties. Financial, on the other hand, contends that the district court erred when it awarded any equitable relief once it had determined that a complete award of rescission and restitution would be, not only inequitable, but impossible. We find no merit in either party's position and, therefore, affirm the district court's award, assuming that, after remand, Financial's defenses are rejected.

An unregistered broker could not enforce an executory contract engaging him to sell securities using interstate facilities. *See* S. Jaffe, Broker-Dealers and Securities Markets § 2.05 (1977). The fact that the unregistered broker has performed his part of the contract should not alter that result. Though the contract be merely voidable, the party who has dealt with the law-breaker can elect that remedy under section 29(b), as we have held. Were this not the result there would be no civil remedy for the failure to register. Because fees are usually contingent, as they were here, the broker who has not performed is entitled to no fee. If the broker who has performed can recover his commission despite non-registration, then the prohibition is a toothless tiger.

■ The illegality of the transaction precludes the recovery of damages for breach and any other judgment aimed at enforcement of the tainted contract. *See* 2 G. Palmer, The Law of Restitution § 8–1, at 171 (1978) [hereinafter cited as *Palmer*].

Thus, persons who perform services without obtaining a required occupational license have been denied recovery either on their contract or in quasi-contract. This precept has been applied to bar compensation to unlicensed lawyers, physicians, real estate brokers, architects and engineers, building contractors, and plumbers. *See* 2 *Palmer, supra,* § 8–3, at 180–181 and cases cited therein. We, therefore, agree with the district judge that the contract employing Financial was voidable, at the option of Regional, and that Financial is not entitled to any fees as yet unpaid.

If an illegal brokerage contract has been performed, and some or all of the fees due the broker have been paid, the questions of recoverability of what has been paid and of the rights of the broker who has rendered valuable services have been dealt with as equitable issues, denominated restitution.

■ We consider first the fees actually paid to Financial, and not deposited in escrow. The fact that public policy embodied in the securities laws prohibits enforcement of the contract is not alone a sufficient reason to allow even an innocent party to retain an unjust enrichment at the expense of a culpable one. *Id.* § 8–1, at 171. Resolution of the problem must be found in a balance of the factors in a specific case: the extent of the enrichment and the degree of unjustness wrought by its retention weighed against the policy against enforcement, the extent of the non-violator's participation, and whether a judgment depriving the violator of the benefits received will subvert the policy underlying the rule of law that makes the transaction illegal. *Id.,* at 174.

■ When the services contracted for have been performed by an unlicensed person, courts have "nearly always" denied restitution of payments made for such services. *Id.,* § 8–3, at 184. Because he has done the work promised, the unlicensed person who received the fee is not unjustly enriched. The person who paid his fee has received actual services. The law, therefore, leaves the parties where it found them.

Finally, we consider the escrowed funds. Under the limited partnership agreements, the limited partners were guaranteed certain payments from cash flow. These debts currently remain unpaid. The contracts between Regional and Financial provided that the funds placed in escrow by Financial would ensure such payments. If Financial is allowed to recover its escrow money, Regional would have to pay out of its own pocket the amounts owed the limited partners. The district court, applying the reasoning of *Eastside Church, supra,* determined that, as between Regional and Financial, this loss, *i.e.,* the obligation to pay the limited partners, should fall on the violator of the Act, Financial. It therefore awarded the funds in escrow to Regional. We concur with both the logic and equity of this result.[21]

### III. Regional's Other Theories of Relief.

Although Regional eventually asserted a number of theories of relief, including section 29(b), section 10(b) of the Act, breach of fiduciary duty, usury, etc., the district court found it necessary to rule only on the section 29(b) claims. On appeal, Regional has continued to assert only one of its other theories, breach of fiduciary duty. Therefore, on the remand that we have ordered, the district court shall, if necessary, rule upon Regional's breach of fiduciary duty claim and any possible defenses Financial may have to that claim. Of course, if the district court should decide on remand that Regional is not, after all, entitled to relief on its section 29(b) claims, but is on its breach of fiduciary duty claim, different relief may be appropriate. In that case,

nothing in this opinion shall be construed as precluding the district court from modifying its judgment to correspond to the different basis of relief.

### IV. Financial's State Court Action.

In addition to the four basic agreements at issue in this case, *i.e.,* those relating to the Kingsley Creek, Thousand Pines and Brooklake projects, which were rescinded by the district court below, and the one relating to Montgomery Mall, which was the subject of a court-approved workout, *see* note 1 *supra,* Regional and Financial entered into one other set of agreements. These agreements, referred to by the parties as the "G. E. Security Agreements," involved Financial's deposit of a $100,000 certificate of deposit and agreement to guarantee a $100,000 letter of credit obtained by Regional from a third party non-affiliated bank to secure an indebtedness to General Electric Credit Corporation in connection with its construction loan on the Montgomery Mall project.

On December 12, 1979, approximately ten months after the filing of the district court's "Memorandum Opinion and Order" setting forth its findings of fact and conclusions of law, but approximately six months before the entry of final judgment, Financial filed an action against Regional in Texas state court seeking damages and an accounting for an alleged breach of the G. E. Security Agreements.

Regional countered this action by applying to the district court for injunctive and declaratory relief, under 28 U.S.C. § 2283[22] and 28 U.S.C. §§ 2201 and 2202,[23] respec-

---

**21.** The limited partners might conceivably assert that they are the parties who should benefit from our (contingent) holding that Financial is not entitled either to the remaining sums due under the agreements or the escrowed funds, because Regional, the general partner, was willing to accept the net sums agreed upon for the sale of the partnership interests. We intimate no opinion concerning whether, if Regional prevails after the hearing on remand, the limited partners have any right against the funds recovered from the escrow account or the funds that Regional would thereby be enti-

tled to retain rather than pay to Financial under the agreements.

**22.** Section 2283 provides:
A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
28 U.S.C. § 2283.

**23.** Section 2201 provides, in relevant part:
In a case of actual controversy within its jurisdiction, ... any court of the United

tively, against the state suit. Regional argued that the subject matter of Financial's state action had already been litigated in this action, or, if not, should have been as a compulsory counterclaim. The district court denied Regional's requests, thereby relegating it to the state court to raise its claim of *res judicata*. Regional appeals.

■ The Anti-Injunction Act, 28 U.S.C. § 2283, absolutely prohibits enjoining state court proceedings unless the injunction would fall within one of its three specifically defined exceptions. *See* note 22 *supra; see generally* 17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 4222, at 314 (1978). The statute, however, does not "qualify in any way the principles of equity, comity, and federalism that must [in its absence] restrain a federal court when asked to enjoin a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 243, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705, 718 (1972). As Judge Wisdom has said for this court,

> We take the view that a complainant must make a strong and unequivocal showing of relitigation of the same issue in order to overcome the federal courts' proper disinclination to intermeddle in state court proceedings. If we err, all is not lost. A state court is as well qualified as a federal court to protect a litigant by the doctrines of res adjudicata and collateral estoppel.

*Southern California Petroleum Corp. v. Harper*, 273 F.2d 715, 719 (5th Cir. 1960). *See also International Association of Machinists & Aerospace Workers v. Nix*, 512 F.2d 125, 131 n.9 (5th Cir. 1975).

■ With regard to requests for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, it is by now well-settled that, even if within the jurisdiction of the district court, the granting of such re-

lief rests in the sound discretion of the district court exercised in the public interest. *See, e.g., PPG Industries v. Continental Oil Co.*, 478 F.2d 674, 680–82 (5th Cir. 1973).

■ In denying Regional's requests for relief under these two statutes, the district court reasoned as follows:

> [The G. E. Security Agreements] were not actively litigated at trial, and hence [Regional is] not entitled to any relief against those agreements in this action. While it is true that the scope of a *res judicata* bar encompasses not only issues tried but issues which might have been tried, it is not the proper role of a Federal court to enjoin every state action to which a plea of *res judicata* might be made on the basis of a Federal judgment. Instead, the court must balance, in the exercise of its equitable jurisdiction, . . . the avoidance of friction between coequal sovereigns against the protection of Federal judgments. In the present case, [Financial's] state court action will interfere with the Federal judgment minimally if at all, since the judgment touches upon the G. E. Security Agreements only tangentially. And that interference falls, if at all, only in the "might have been litigated" zone of *res judicata*. If the subject matter of the state suit was indeed a compulsory counterclaim in this court, a question on which the court expresses no opinion, the state court may properly be relied upon to sustain [Regional's] plea of *res judicata* or collateral estoppel.

Unpublished District Court Order of June 23, 1980, at 2. We detect no error or abuse of discretion in this ruling and affirm the district court's denial of injunctive and declaratory relief.

In sum, we AFFIRM the district court's decision insofar as it held that (1) Regional

States, upon the filing of an appropriate pleading may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

Section 2202 provides:

> Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. § 2202.

was entitled to bring, under section 29(b), a private action to void its agreements with Financial, and (2) Regional proved a *prima facie* case under that section. We VACATE the judgment and REMAND so that the district court, in accordance with this opinion, may make appropriate fact findings and rule upon Financial's asserted defenses to Regional's section 29(b) claims, and, if necessary, rule upon Regional's breach of fiduciary duty claim. We AFFIRM the district court's award of relief in the case that Regional is ultimately determined to be entitled to relief under section 29(b). And, we AFFIRM the district court's refusal to grant either injunctive or declaratory relief against Financial's state court action.