Lauriat, Peter M., J.
In this action, the plaintiff, Maiden Lane Partners, LLC (“Maiden Lane”), seeks to recover money it claims it is owed by the defendant, Perseus Realty Partners, G.P. II, LLC (“Perseus”), under a contract between the parties. Perseus has now moved for partial summary judgment on Count II of its counterclaim, and for summary judgment on Maiden Lane’s claims. For the following reasons, Perseus’ motion is denied.
BACKGROUND
The record before the court reveals the following facts as undisputed, unless otherwise noted. Maiden Lane is a limited liability company established in 2000 by James H. Kelly (“Kelly”) and Edward Theobold (“Theobold”), both of whom had experience as marketers in the securities industry. Until it became inactive in 2009, Maiden Lane represented approximately twenty-five to thirty-five investment managers, including Perseus, for whom it identified and introduced potential sources of investment capital. On behalf of its clients, Maiden Lane would approach potential investors, ask about their particular funds and what capital they had available, and for what specific asset classes, such as real estate. If there was a “fit” between an investor and a client, Maiden Lane would put together marketing presentations, comment on marketing pitch books, suggest that the investor consider Maiden Lane’s client, and request that the investor meet with the client. Maiden Lane’s fee was determined by the amount actually invested in the client. At no time relevant to this action were Maiden Lane or its principals registered as securities broker-dealers as that term is construed under 15 U.S.C. §78o(b).
Perseus is a limited liability real estate investment management firm, offering investment opportunities to institutional and private investors. At all relevant times, Richard C. Dougherty (“Dougherty”) was the president and chief investment officer of Perseus, and John G. Jarrett, Jr. (“Jarrett”) was its managing director of marketing and investor relations. PRP II, L.P. (the “Fund”), the fund at issue here, is a limited partnership.
In 2007, Kelly contacted Dougherty and proposed that Maiden Lane work with Perseus in Perseus’ efforts to raise capital, in particular for the Fund.[1] After some discussion and a meeting, Kelly provided Dougherty and Jarrett with a list of about thirty prospective investors, consisting of entities with whom Kelly and Theobold had “good relationships and good access.” On November 5, 2007, Perseus and Maiden Lane executed a Marketing Consulting Agreement (the “Consulting Agreement”).
The Consulting Agreement provided that Maiden Lane “is hereby retained by Perseus Realty Partners as a marketing consultant to assist Perseus Really Partners in identifying potential investors for the capital fundraising [sic] campaign of PRP II, L.P. Maiden Lane will concentrate its efforts on institutional invest *381 ors, consultants, and financial institutions listed in the attached Schedule I—Maiden Lane Prospect List Maiden Lane and Perseus Realty Partners may amend Schedule I at any time in the future.” The Consulting Agreement provided that Maiden Lane would be paid a fee of 2% of all commitments to the [PRPII Fund] as a direct result of an introduction and referral made by [Maiden Lane] from the attached [Schedule I]." On November 12, 2007, Maiden Lane requested that Plymouth County be added to Schedule I.
According to Kelly’s deposition testimony, Jarrett in December 2007, informed Kelly that he had had one or more conversations with Anthony Minopoli of the Knights of Columbus, and thought that they might be interested in investing in the Fund, but that he “needed to get traction” in order to close the deal quickly. There is no dispute that the Knights of Columbus is not listed on Schedule I. Kelly told Jarrett that his associate, Ted Swedock (“Swedock”) had a relationship with Minopoli and offered to help. Kelly testified that Jarrett agreed, and although Kelly asked Jarrett for written confirmation of the conversation, no such memorialization was forthcoming. Kelly understood, however, that any services that Maiden Lane would perform with respect to the Knights of Columbus were within the terms of the Consulting Agreement.
Kelly and Theobold decided to engage Swedock to take the lead in communicating with Minopoli since the two had worked closely together in the past. Neither Kelly nor Theobold at any time communicated with the Knights of Columbus. Theobold testified that Swedock met with Minopoli about every three weeks or more between December 2007, and March or April 2008, and reported back to Theobold the content of those conversations, describing some of the obstacles to investing that had been raised by the Knights of Columbus, what Dougherty or Jarrett should do to be in touch with Minopoli, and how to expedite the due diligence visit. During that visit, according to The-obold, Minopoli called Swedock regarding additional issues that Minopoli thought should be addressed, Swedock reported this to Kelly and Theobold, who relayed the information to Perseus.
Effective April 2, 2008, The Knights of Columbus General-Life and the Knights of Columbus Retirement Plan for Non-Bargaining Unit Employees invested a total of $20,000,000 in the Fund. At some point, Dougherty informed Kelly of the investment, and about one month later Kelly contacted Jarrett by telephone to request payment. Although Jarrett told Kelly that “a check would be forthcoming,” once some internal matters regarding a loan had been resolved, and despite at least three subsequent telephone conversations, Dougheriy by email dated June 27, 2008 informed Maiden Lane that the Knights of Columbus investment was the result of Jarrett’s connections and efforts, and that he understood Maiden Lane’s request to be only for expenses incurred. On July 10, 2008, Maiden Lane submitted to Perseus a written invoice in the amount of $400,000 for services rendered.
When Perseus failed to make any payment to Maiden Lane or Swedock, Maiden Lane filed this action, asserting claims for breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), and violation of G.L.c. 93A (Count III). In response, Perseus counterclaimed, asserting claims for breach of contract (Count I), rescission pursuant to 15 U.S.C. §78cc(b) (Count II), breach of the covenant of good faith and fair dealing (Count III), fraud (Count IV), and violation of G.L.c. 93A (Cpunt V). Perseus has now moved for partial summary judgment on Count II of its counterclaim and for summary judgment on all of Maiden Lane’s claims.
DISCUSSION
Summary judgment will be granted where, viewing the evidence in the light most favorable to the non-moving parly, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). “The moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
The gist of Perseus’ argument is that the Consulting Agreement is unenforceable under Section 29(b) of the Securities Exchange Act of 1934, because Maiden Lane, by its own admissions, acted as an unlicensed broker-dealer in violation of 15 U.S.C. §§78o, 78(a)(4)(A). Perseus does not contend that Maiden Lane or its principals acted as brokers with respect to the Knights of Columbus; to the contrary Perseus maintains that the Knights of Columbus was not listed in Schedule I and, in any event, it was Jarrett who found that investor. Rather, Perseus confines its assertions to Maiden Lane’s general course of conduct with respect to all its clients, as described by Kelly and Theobold. It contends that Maiden Lane acted as a broker and was thus required to register as such with the SEC. Because Maiden Lane failed to do so, Perseus contends that the Consulting Agreement is void as a matter of law.[2] This, Perseus argues, effectively disposes of Maiden Lane’s contractual claims. Maiden Lane, for its part, denies Perseus’ assertions; it claims that it acted only as an intermediary, or “finder,” rather than as a broker. Were the court to conclude otherwise, Maiden Lane asserts that, even after Dougherty knew that Maiden Lane was not registered, Perseus continued to request that Maiden Lane perform under the Consulting Agreement. Therefore, Maiden Lane contends, Perseus is not an “innocent party” and rescission must be denied.
*382 In general, the Exchange Act provides that any person who engages in the business of effecting transactions in securities for the account of others is a broker and is therefore required to register as a broker-dealer with the Securities and Exchange Commission. 15 U.S.C. §§78c(4)(A), 78c(a)(l).[3],[4] Because the Exchange Act does not define either “effecting transactions” or “engaging] in the business,” courts have set forth an array of factors to consider in making a determination as to what constitutes broker activity. Those include whether the person is an employee of the issuer, receives commissions as opposed to a salary, is involved in negotiations between the issuer and the investor, makes valuations as to the merits of the investment or gives advice, and is an active rather than passive finder of investors. See, e.g., Securities & Exchange Comm'n v. Martino, 255 F. Sup.2d 268, 283 (S.D.N.Y. 2003), and cases cited. See also Cornhusker Energy Lexington, LLC v. Prospect Street Ventures, Fed.Sec.L.Rep. (CCH) P93.974, 2006 U.S. Dist LEXIS 68959 at *19 (D.Neb. 2006) (broker analyzes the financial needs of the issuer; recommends or designs financing methods; is involved in negotiations, and discussions of details of securities transactions; makes investment recommendations; and was previously involved in the sale of securities).
Some of the above factors may be more indicative of broker activity than others. The court in SEC v. Bravata, 2009 WL 2245649 at *2 (E.D.Mich. 2009), noted that “the most important factor in determining whether an individual or entity is a broker” is the “regularity of participation in securities transactions at key points in the chain of distribution.” Although one of the hallmarks of being a broker is receiving transaction-based compensation, see id. at *6, this is by no means dispositive. See SEC v. Kramer, 2011 WL 1230808 at *16 n.54 (M.D.Fla. 2011). The court in Kramer, citing Cornhusker, stated that “transaction-based compensation is the hallmark of a salesman. By contrast, a person’s recommending a particular investment or participating in a negotiation typically occurs in an array of different commercial activities and professional pursuits, including brokering.” Id. at *10.
In certain limited circumstances, “a person or entity may perform a narrow scope of activities without triggering broker/dealer [sic] registration requirements.” Cornhusker, 2006 U.S.Dist. LEXIS at *18. “The distinction drawn between the broker and the finder or middleman is that the latter lbring[s] the parties together with no involvement on [his] part in negotiating the price or any of the other terms of the transaction.’ ” DeHuff v. Digital Ally, Inc., Fed.Sec.L.Rep. (CCH) P95,549, 2009 U.S.Dist. LEXIS 116328 at *13 (S.D.Miss. 2009) (citing Salamon v. Teleplus Enters., Inc., Fed.Sec.L.Rep. (CCH) P94,742, 2008 U.S.Dist. LEXIS 43112 at *42 (D.N.J. 2008).[5] “Merely bringing together the parties to transactions, even those involving the purchase and sale of securities, is not enough” to warrant broker registration under Section 15(a). Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp., 2009 WL 2777869, *3 (N.D.Tex. 2009). The evidence must also show involvement at “key points in the chain of distribution,” such as participating in the negotiation, analyzing the issuer’s financial needs, discussing the details of the transaction, and recommending an investment. Cornhusker, 2006 WL 2620985 at *6. “Even if the finder receives a fee in proportion to the amount of the sale—i.e., a percentage of the total payment rather than a flat fee—the Commission has been willing to find that there was no need for registration.” Kramer, 2011 WL 1230808 at *12, citing David A. Lipton, 15 Broker-Dealer Regulation §1:18 (internal quotations omitted).
If contracts are made in violation of the registration requirements, the Exchange Act provides for their rescission. 15 U.S.C. 78cc(b).[6] In order to avoid a contract, a party must show that “(1) the contract involved a ‘prohibited transaction,’ (2) [it] is in contractual privity with the defendant, and (3) [it] is ‘in the class of persons the Act was designed to protect.’ ” DeHuff, 2009 U.S.Dist. LEXIS 116328 at *6.[7] Even then, a contract is not automatically void, but only voidable at the option of the innocent party. Cornhuskers, 2006 U.S.Dist. LEXIS at *24. In an action seeking rescission, all equitable defenses are available. See, e.g., id. at *24-*25, and cases cited; see also Regional Props., Inc. v. Financial and Real Estate Consulting Co., 678 F.2d 552 (5th Cir.1982).
The court concludes that, on the record before it, there are genuine issues of material fact as to whether Maiden Lane acted as a “broker,” as Perseus alleges, and thus was required to register with the SEC, or whether Maiden Lane acted only as a “finder” and hence is relieved of that requirement. Kelly testified that Maiden Lane would typically “work with money managers to identify sources of capital, put together marketing presentations, comment on market pitch books, basically steer the money manager through the whole sales cycle.” Maiden Lane asked investors about the nature of the funds to be invested and, “[w]hen there was an opportunity for the manager we were representing to be hired by that prospective investor, we would ask them... to consider that manager.” Any documentation describing Perseus was generated by Perseus and provided either by Maiden Lane or Perseus to prospective investors. At some point, Maiden Lane “would introduce Perseus to set up meetings with Perseus and the prospective investor . . .”[8]
It is undisputed that Maiden Lane’s commission was to be based on the successful completion of a transaction under the Consulting Agreement. It is unclear, however, whether Maiden Lane analyzed Perseus’ needs (or that of other clients), “recommended” Perseus or any of its other clients to investors, was involved in “key points in the chain of *383 distribution,” or was involved in negotiating any transactions. The court therefore cannot resolve the issue of whether Maiden Lane’s activities amounted to those of a broker. That determination will involve assessments of credibility as well as the development of a full record.
So too regarding Maiden Lane’s equitable defense of unclean hands. Perseus is entitled to rescission only if it is an innocent party. In Perseus’ Response to Interrogatory No. 5, Perseus claims that Dougherty asked Kelly in the spring of2007 whether Maiden Lane had a broker’s license, to which Kelly answered in the affirmative. Kelly, however, testified that no such conversation took place. In that same answer, Perseus states that in May 2008, Dougherty checked the SEC website and discovered that there was no record of Maiden Lane’s broker-dealer registration. Nonetheless, in an email to Kelly dated May 30, 2008, Dou-gherty outlined topics he wanted to discuss with Kelly, including progress with respect to several potential investors. Emails from Dougherty to Kelly dated June 1, 2008, June 3, 2008, June 10, 2008, June 12, 2008, and June 27, 2008, indicate that Dougherty continued to ask Kelly’s advice on a variety of investor-related topics.
In addition, Dougherty testified that he and Jarrett met with Kelly and Theobold in July 2008 to try to resolve Maiden Lane’s claim for payment and “to preserve the relationship.” He stated that Perseus “made several efforts, both in writing and over the phone ... to try to resolve the issue.” By email to Kelly dated July 14, 2008, Dougherty wrote: “[t]o resolve our understanding, I propose that we pay Maiden Lane Partners a 1% commission for assisting PRP secure [sic] the $20 million commitment from the Knights of Columbus as per the payment schedule that is outlined in our agreement. There will be an additional 1% bonus paid Maiden Lane as per the agreed upon payment schedule upon the securing of an additional $20 million commitment from one of the investors that is listed in the addendum to this agreement. Please let me know if this is acceptable to Ted, Ed and you.” The remainder of the email asks for information regarding other investors and states that “[w]e need to expand the dialogue and do a better job communicating so that we can respond to these investors in a timely manner.”
Even if a reasonable jury finds that Maiden Lane acted as an unregistered broker in violation of the Exchange Act, it could also find that Perseus, by its conduct, knew of and acquiesced to that violation and was not therefore an innocent party. In that event, rescission would be prohibited and Maiden Lane’s contractual claims would stand.
ORDER
For the foregoing reasons, Perseus Really Partners’ Motion for Partial Summary Judgment on the Claim to Rescind the Contract and for Summary Judgment on Plaintiffs Claims is DENIED.

 Maiden Lane had provided some services to Perseus in 2006, but without a contract.

It appears that Perseus is claiming that Maiden Lane and its principals acted as broker-dealers with respect to Perseus (excluding any conduct regarding the Knights of Columbus) as well as with respect to its other clients.

 15 U.S.C. 78(c)(4)(A) defines “broker” as “any person engaged in the business of effecting transactions in securities for the account of others.”

 15 U.S.C. §78o(a)(l) reads, in pertinent part:
It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers’ acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

While both parties cite to several SEC No-Action letters in their respective memoranda, the cited letters present inconsistent and often contradictory criteria for determining whether an entity is a broker. For example, in Mike Bantuveris, SEC No-Action Letter, 1975 WL 10654 at *4 (October 23, 1975), the SEC concluded that registration was required where the party would “do more than merely act as a finder in bringing together the parties to transactions involving the purchase and sale of securities: the firm proposes to negotiate agreements involving transactions in securities, to engage in further activities to consummate the transactions, and to receive fees for its services that would be proportional to the money or property obtained by its clients and would be contingent upon such transactions in securities.” The SEC in John R. Wirthlin, 1999 WL 34898 at *1 (January 19, 1999), noted that the party was required to register as a broker where it “would be, in effect, soliciting investments in real estate limited partnership interests from investors through their advisers (the Professionals), and arranging and attending the first meeting between the registered representative and Professionals that are interested in discussing such investments based on your solicitation. You would also receive transaction-based compensation, one of the hallmarks of being a broker-dealer.” In Davenport Mgmt., Inc., Fed.Sec.L.Rep P 76,643, 1993 WL 120436 at *13 (April 13, 1993), the SEC opined that where the requesting party was going to, inter alia, “be actively involved in securities transactions, by negotiating their terms, providing advice regarding their terms, or providing other assistance” it would be acting as abroker. In Brumber, Mackey & Wall, P.L.C., 2010 WL 1976174 at *2 (May 17, 2010), the SEC opined that “the introduction to [the issuer] of only those persons with a potential interest in investing in [the issuer’s] securities implies that BMW anticipates both ‘pre-screening’ potential investors to determine their eligibility to purchase the securities, and ‘pre-selling’ [the issuer’s] to gauge the investor’s interest.” The SEC’s No-Action letters are, however, informal and “highly dependent on the facts of a particular arrangement.” Kramer, 2011 WL 1230808 at *12. Because No-Action letters are neither legally binding nor persuasive, id. at *16 n.54, while the court has read and considered them, it does not rely upon them in reaching its conclusion.

 15 U.S.C. §78cc(b) reads, in pertinent part:
*384 Every contract made in violation of any provisions of this title [15 USCS §§78a et seq.] or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title [15 USCS §§78a et seq.] or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract. . .

There is no dispute as to the second and third requirements.

Perseus’ contention that Malden Lane acted as a broker is based entirely on Malden Lane’s own admissions and on the testimony of Kelly and Theobold with respect to Perseus, or with respect to Maiden Lane’s general course of conduct. There Is no specific evidence in the record with respect to Malden Lane’s activities on behalf of any other client.