COULDOCK & BOHAN, INC. and
William Scalzi, Plaintiffs,

v.

SOCIÉTÉ GENERALE SECURITIES
CORPORATION, Defendant.

No. 3:97 CV 0274 GLG.

United States District Court,
D. Conn.

March 29, 2000.

222

Michael G. Considine, Catherine Dugan O'Connor, Day, Berry & Howard, Stamford, CT, for Plaintiffs.

Curtis E. Pew, Charles M. Davidson, Duane, Morris & Hecksher, New York City, Stephen L Ratner, Steven Haber, Rosenman & Colin, New York City, Richard J. Tucker, Duane, Morris & Heckscher, Wilmington, DE, Louis J. Bonsangue, Jacobi, Kappel & Case, Milford, CT, for Defendant.

## MEMORANDUM OPINION

GOETTEL, District Judge.

Plaintiffs Couldock & Bohan, Inc. ("CBI") and William Scalzi brought this action claiming breach of contract, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), and various tort causes of action against Defendant Société Generale Securities Corporation ("SG"), invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Defendant now moves for summary judgment on all Counts [Doc. No. 31]. For the reasons set out below, the Court GRANTS summary judgment in favor of Defendant as to all counts.

## INTRODUCTION

Plaintiffs' claims arise from Defendant's termination of the parties' clearing agreement without notice. Defendant maintains that the clearing agreement, the contract which governed the parties' clearing arrangement, was void for illegality because neither CBI, a broker-dealer[1] trading a variety of non-equity securities, nor Scalzi, CBI's chief shareholder and president, were registered with the Securities Exchange Commission ("SEC") or the Connecticut State Commissioner of Banking, nor were they members of the National Association of Securities Dealers ("NASD"),[2] and thus they were in violation of federal and/or state securities laws.

After a thorough review of the record, drawing all inferences in favor of the non-moving party, the Court determines the relevant facts to be as follows. Plaintiff CBI is a Connecticut corporation which, from 1988 until May 1996, was in the business of arranging purchases and sales of non-equity securities, including money market instruments[3] and government bonds. Plaintiff William Scalzi is the chief shareholder and president of CBI. Defendant SG is a New York corporation and a registered broker-dealer that served as a clearing broker[4] for its customers and for other broker-dealers.

---

1. The term "broker" is defined by the Securities Exchange Act of 1934 ("Exchange Act" or "1934 Act"), codified as amended at 15 U.S.C. § 78a *et seq.*, to mean "any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank." Exchange Act § 3(a)(4). The term "dealer" is defined as "any person engaged in the business of buying and selling securities for his account, through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business." Exchange Act § 3(a)(5). The term "broker-dealer" is defined in the Connecticut Uniform Securities Act as "any person engaged in the business of effecting transactions in securities for the account of others or for his own account...." Connecticut Uniform Securities Act ("CUSA"), Conn. Gen.Stat. § 36b-3(3).

   Since many brokerage firms operate both as brokers and dealers, and because both brokers and dealers are subject to the registration requirements under federal and state laws, the term "broker-dealer" is frequently used in the securities industry almost interchangeably with the terms "broker" and "dealer," with little distinction given to the different types of trading activity involved.

   *See* David A. Lipton, *A Primer on Broker-Dealer Registration*, 36 Cath. U.L.Rev. 899, 909–10 (1987).

2. With certain exceptions, all brokers and dealers who register who register with the SEC must become members of the NASD. Rule 15b9–1, 17 C.F.R. § 240.15b9–1; Exchange Act § 15(b)(8).

3. The money market is a "wholesale market for low-risk, highly-liquid, short-term IOU's. It is a market for various sorts of debt securities rather than equities." Marcia Stigum, *The Money Market: Myth, Reality, and Practice* 1 (1978). Money market instruments include, *inter alia*, negotiable certificates of deposit, Eurodollar certificates of deposit, commercial paper, banker's acceptances, Treasury bills, and discount notes of certain federal agencies. *Dictionary of Finance and Investment Terms* 339–41 (Downes & Goodman, eds., 4th ed.1995).

4. A clearing broker provides clearance services to its correspondents. Clearing, in the context of securities, consists of the comparison of the details of a transaction between brokers prior to settlement, and the final exchange of securities for cash on delivery. *Dictionary of Finance and Investment Terms,*

On May 26, 1992, Plaintiff CBI and Defendant entered into a clearing agreement under which Defendant agreed to clear CBI's money market instrument trades by acting as principal[5] in CBI's clearing transactions. The clearing agreement is evidenced by a one-page document which was apparently patterned after a nearly identical letter agreement dated June 11, 1991 between CBI and Swiss Bank Corporation Investment Banking, Inc. ("SBCI"), an entity which provided clearing services for Plaintiff prior to May, 1992. At that time, SBCI exited the clearing business and Defendant acquired its clearing services operations. Plaintiff claims that in soliciting its business, Defendant promised to provide clearing services on the same terms as SBCI had, and that Defendant represented that it would not terminate the parties' clearing arrangement without ninety days notice. The terms of the clearing agreement required CBI to have a buyer and seller for each trade, with both sides of the transaction occurring simultaneously. The agreement prohibited CBI from holding any overnight positions and provided that Defendant would charge a flat fee for each side of the trade "whether the clearance is physical or through DTC."[6] Plaintiff was required to transmit completed trade details via fax to Defendant for clearing. CBI also agreed to compensate Defendant for "[a]ny interest loss due to [CBI's] error or omission (such as not having correct denominations available for delivery) . . . ."

In addition to the clearing agreement, Defendant and CBI entered into at least fourteen separate agreements (the "principal letters") with CBI's trading counterparties. In each of the principal letters, Defendant, CBI, and the trading counterparty agreed that Defendant would act as principal on CBI's behalf to clear CBI's trades with that particular counterparty. The principal letters provided for a trading procedure in which the counterparty would notify Defendant of each transaction, Defendant would confirm the trade with CBI, and Defendant would either approve or "dk"[7] the transaction. CBI agreed to reimburse the counterparty for any losses incurred as a result of Defendant not approving a trade. The principal letters further provided that the agreement would remain in force "unless terminated in writing by either [sic] party."

Defendant cleared CBI's trades pursuant to the May 1992 clearing agreement and the principal letters from May, 1992 until April 30, 1996, at which time Defendant notified CBI that Connecticut State regulators had contacted Defendant with inquiries about CBI's trading activities. In particular, the state regulators were investigating CBI's registration status, since CBI had been listed for some years in Standard & Poor's *Security Dealers of North America* as a registered broker-dealer. Defendant informed Plaintiffs that there was a possibility that it might be required by federal and state securities laws to treat CBI as a customer rather

*supra* note 3, at 88–89. Securities may be delivered physically or electronically, depending on the type of security.

5. Both parties have characterized Defendant's clearing activities by using the terminology "acting as principal" in accordance with the customary usage in the securities industry. In legal parlance, the parties' agreement created an agency relationship in which CBI was the principal and Defendant acted as CBI's agent. In essence, Defendant agreed to stand in CBI's stead for the purposes of receiving and delivering securities against payment for CBI's account.

6. The Depository Trust Company ("DTC"), developed by the New York Stock Exchange as a subsidiary in which the exchange now shares ownership with banks and other organizations, is a clearing agency and central securities repository which provides clearing services for participating clearing brokerage firms and institutions. Most of the clearing services take place electronically.

7. "DK," meaning "deny knowledge" in industry argot, is a term used by a clearing broker or agent to reject an attempted delivery of a security that does not match in every detail the security that is expected to be delivered.

than a registered broker-dealer. Such a change in status would require CBI to post margin on each purchase of non-exempted financial instruments.[8] The parties do not dispute that Defendant cleared trades for CBI in both exempted and non-exempted securities.[9]

Defendant notified CBI by letter dated May 7, 1996 that "effectively immediately" CBI would be considered a customer and therefore would be required to post "proper customer margin" on all its transactions. In addition, the letter stated that "any activity in [CBI's] accounts must be booked as trades and not reflected as 're-ceives' or 'delivers.'" The next day, Defendant sent written notice to the counterparties that had executed principal letters terminating the principal letters "effective immediately." [10]

Plaintiffs claim that Defendant breached the clearing agreement by terminating the relationship without ninety days notice and by the sudden imposition of the customer margin requirement, thus making it impossible for CBI to continue doing business. Plaintiffs set forth six counts in their complaint. Plaintiff CBI asserts five counts claiming: (1) breach of contract with respect to the parties' clearing agreement; (2) breach of the implied covenant of good faith and fair dealing; (3) misrepresentation; (4) violation of Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110b(a); and (5) tortious interference with business relationships with its clients. In Count Six, Plaintiff Scalzi asserts a claim for tortious interference with his business relationship with CBI.

Defendant asserts in its defense that CBI's trading practices violated federal and state security laws, which mandated Defendant's refusal to treat CBI as a registered broker-dealer and necessitated the imposition of the customer margin requirement. Defendant denies that it terminated its clearing relationship with Plaintiffs, but instead claims that it merely imposed the customer margin requirement. Defendant further alleges that the clearing agreement was void due to illegality pursuant to Section 36b–29(h) of the Connecticut Uniform Securities Act ("CUSA"),[11] because of Plaintiff's failure to register as a broker-dealer in the State of Connecticut. Defendant also denies liability for the tort claims asserted by Plaintiffs, and urges the Court to grant summary judgment in its favor due to the absence of any genuine issue of material facts.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Fed. R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). There is no genuine issue of material fact if the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When ruling on a summary judgment motion, a court must construe the facts in a light most favorable to the non-moving party and

8. Section 3(a)(12)(A) of the Exchange Act defines exempted securities to include, *inter alia*, United States government securities and municipal securities.

9. Beginning in August, 1992, CBI submitted trades to Defendant in money market instruments (short-term debt instruments), medium-term notes, bank holding company instruments, and corporate securities. CBI began trading Canadian government securities in July, 1994; it began trading United States government securities in November, 1995.

10. It is unclear from the record whether CBI traded with any counterparties other than those who had executed principal letters.

11. Conn. Gen.Stat. §§ 36b–2 to 36b–33, inclusive.

must resolve all ambiguities and draw all reasonable inferences against the moving party. *Id.* at 255, 106 S.Ct. 2505. If there is no genuine issue of material fact, the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As a federal court sitting in diversity jurisdiction, we apply state substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Applying Connecticut law to the undisputed facts establishes that Defendant is entitled to judgment as a matter of law on all counts.

## DISCUSSION

### I. Breach of Contract Claim

In its first count, Plaintiff CBI [12] asserts breach of contract, arguing that the sudden imposition of the customer margin requirement effectively terminated the parties' clearing relationship in violation of the ninety day notice term of the parties' agreement. As noted above, the clearing agreement was a one-page document which did not purport to represent the parties' complete and final agreement. Although the written agreement does not specify a notice period, Plaintiff claims that when Defendant solicited Plaintiff's clearing business in May of 1996, it orally promised at least ninety days notice prior to terminating the clearing arrangement.

**12.** For simplicity, the term "Plaintiff" refers solely to CBI with respect to the first five counts.

**13.** Section 36b–29(h) of CUSA provides:

No person who has made or engaged in the performance of any contract in violation of any provision of sections 36b–2 to 36b–33, inclusive, or any regulation or order hereunder, or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any cause of action on the contract.

**14.** Section 15(a)(1) of the Exchange Act provides:

Ordinarily, a disputed oral promise would present a genuine issue of material fact, precluding summary judgment. In this case, however, the Court assumes for the purposes of this motion that Defendant did, in fact, make the oral promise to give ninety days notice prior to terminating the parties' clearing arrangement. The Court also assumes, as we did at oral argument, that Defendant was aware that Plaintiff was not registered as a broker-dealer at the time the parties entered into the clearing agreement. Moreover, drawing all inferences in favor of Plaintiffs, as the Court must for the purposes of this motion, we will proceed from the assumption that Defendant completely terminated the clearing agreement.

As noted earlier, Defendant argues that Plaintiff's trading activities violated federal and state securities laws and that, as a result, the clearing agreement is unenforceable. Specifically, Defendant alleges that Plaintiff's failure to register as a broker-dealer pursuant to Section 36b–6(a) of CUSA violated state securities laws, and that Plaintiff is prohibited from basing any cause of action on the clearing agreement, pursuant to Section 36b–29(h) of CUSA. [13] Defendant does not, however, argue that the clearing agreement violated the analogous federal statute requiring broker-dealer registration in the Exchange Act, Section 15(a)(1), [14] or that the agreement is

It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

thereby void pursuant to Section 29(b) of the Exchange Act.[15]

Defendant does, however, assert that the clearing arrangement required it to extend credit to Plaintiff in violation of Section 7 of the Exchange Act [16] and Regulation T,[17] and asserts that any waiver of compliance with the margin regulations would have violated Section 29(a) of the Exchange Act.[18] Defendant further alleges that Plaintiff violated Regulation X [19] by obtaining purpose credit without posting the required margin, and that Plaintiff's trading without posting the required margin constituted "free-riding."[20] In its memoranda of law, Defendant discusses at length the regulatory framework that sets forth the margin requirements. However, the clearing agreement is silent on the issue of margin, and therefore, we assume that the agreement could have been carried out in full compliance with federal margin requirements. Moreover, Plaintiff does not allege that Defendant made any representations regarding margin requirements. There are no facts to support the Defendant's allegation that the clearing agreement *required* it to extend credit to Plaintiff in violation of the securities laws. Nor does the record support the allegation that Defendant's imposition of the customer margin requirement constituted a breach of the clearing agreement. Furthermore, we assume that, rather than merely demanding margin on all future trades, Defendant terminated the clearing relationship completely.

We turn our attention to Defendant's assertion that the contract was void for illegality. Generally, a contract made in violation of a statute is illegal and unenforceable, and it is usually immaterial whether the thing forbidden by statute is

15. Section 29(b) of the Exchange Act provides, in relevant part:

Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract ... heretofore or hereafter made the performance of which involves the violation of, or the continuance or any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract. . . .

16. Section 7 of the Exchange Act provides, in relevant part:

(c) Unlawful credit extension to customers
(1) Prohibition
It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—
(A) on any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System ... shall prescribe . . . .

17. Regulation T, promulgated by the Board of Governors of the Federal Reserve System pursuant to Section 7 of the Exchange Act, codified at 12 C.F.R. § 220, prohibits broker-dealers from extending credit except where the purchaser posts the required margin.

18. Section 29(a) of the Exchange Act provides:

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of any exchange required thereby shall be void.

19. Regulation X, codified at 12 C.F.R. § 224, promulgated by the Board of Governors of the Federal Reserve System pursuant to Section 7 of the Exchange Act, prohibits purchasers of securities from willfully obtaining purchase credit, i.e., credit to purchase or carry securities without providing the required margin, in contravention of Regulations T or U.

20. "Free-riding" is a scheme in which a customer purchases a security in a brokerage account without sufficient capital to pay for it, and finances the purchase by selling the same security on the same day, usually through another brokerage firm. Free-riding in a cash account violates the customer margin requirements of Regulations T, U, and X. *See S.E.C. v. Hansen,* 726 F.Supp. 74 (S.D.N.Y. 1989); *S.E.C. v. Margolin,* 1992 WL 279735, at *1, 3–4 (S.D.N.Y. Sept.30, 1992); *In re Lewco Sec. Corp.,* 1995 WL 584085 (S.E.C. 1995).

*malum in se* or *malum prohibitum. See* 17A C.J.S. *Contracts* § 197. The Restatement Second of Contracts provides: "If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if (a) the requirement has a regulatory purpose, and (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement." 2 Restatement (Second) of Contracts § 181 (1981). The federal and state securities statutes codify the common law doctrine invalidating contracts that violate their respective provisions. We therefore proceed to examine Plaintiff's trading activities to determine whether its transactions violated any provisions of the Exchange Act, any federal rules or regulations, or CUSA.

### A. Plaintiff's Trading Activities

Plaintiff bases its argument on the premise that it did not buy or sell securities. Plaintiff claims that it transacted business by "arranging purchases and sales" of securities by others, i.e., by "match[ing] prospective sellers of ... financial instruments with prospective buyers." (Compl. at 3). Plaintiff vigorously and repeatedly denies that it was a buyer or seller of securities for its own or anyone else's account, and consequently claims that it was neither required to register as a broker-dealer nor was it in violation of the registration requirements of the Exchange Act and/or CUSA. In support of its position, Plaintiff points to the fact that it arranged both sides of the trade before submitting the details of the transaction to Defendant for clearing, and that it submitted the trade details on both the buy and sell sides of the trades concurrently on one fax sheet. Plaintiff further argues that all trades that it had arranged occurred simultaneously. Plaintiff urges the Court to find that the sellers sold the securities directly to the buyers, and that Plaintiff was uninvolved in the transactions. The undisputed facts prove otherwise.

The Court notes first that "buy" means "[t]o acquire the ownership of property by giving an accepted price or consideration therefor; or by agreeing to do so; to acquire by the payment of a price or value; to purchase ... [t]o obtain something for a price, usually money." *Black's Law Dictionary* 200 (6th ed.1990). The Exchange Act states that "[t]he terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire." Exchange Act § 3(a)(13). Conversely, "[t]he terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." *Id.* § 3(a)(14).

■ After a thorough review of the undisputed facts, particularly the clearing procedure for processing Plaintiff's trades, the Court is convinced that Plaintiff was a buyer and seller of securities. With respect to each trade, Defendant was processing two separate transactions on behalf of Plaintiff, first the purchase and then the sale of the security. Each transaction followed a similar pattern. Plaintiff first located a seller and buyer of a particular security and negotiated different prices with each. Ordinarily, in order to make the trade profitable, the buy price would be lower than the sell price. After confirming the trades with the buyer and seller, Plaintiff sent the trade details on both the buy and sell sides of the transaction via a one-page fax to Defendant for its approval and clearing. Defendant confirmed its approval of the trade and forwarded the trade details to its clearing agent, DTC, usually for wire transfer or book-entry clearing. Defendant accepted delivery of the securities into its DTC Participant account on Plaintiff's behalf, and payment for the securities was deducted from Defendant's DTC account.

At this stage in the transaction, Plaintiff's fervent protestations notwithstanding, Plaintiff was the owner of the security. It had acquired the security by giving an accepted price for it. The seller had deliv-

ered the security to Defendant on behalf of Plaintiff, and the seller had, in return, received payment from Defendant on behalf of Plaintiff.[21]

Plaintiff, in its capacity as the new owner of the security, then sold the securities to a buyer at a separately negotiated price. As per Plaintiff's faxed instructions, Defendant ordered DTC to deliver the securities out of its DTC account to the buyer in exchange for payment received. When Defendant received the credit in its DTC account, it credited Plaintiff's account with the net amount, i.e., the difference between the purchase price and the sale price of the security.

Plaintiff argues that it was merely matching buyers and sellers and that its trades were riskless. The fact that Plaintiff arranged to sell the security shortly after, or even simultaneously with, its purchase is irrelevant.[22] The fact that it notified Defendant of both sides of the trades on one fax sheet is also irrelevant. Plaintiff concedes that in each of its "matched transactions," the seller, who knew Plaintiff as the purchaser, directed the delivery of the securities to Defendant for Plaintiff's account. (Scalzi Dep. at 11–12).[23] The seller did not know the identity, or even the existence, of any buyer other than Plaintiff. On the other side of the transaction, the buyer knew Plaintiff as the seller of the security and directed its payment for the security to Defendant for Plaintiff's account.

Plaintiff appears to be claiming that it was acting as an agent or "finder." "Finders," a term not defined in the Exchange Act, put into contact with each other, for a fee, potential buyers and sellers of securities who then complete any resulting transaction directly between themselves.[24] In Plaintiff's transactions, however, the buyer and seller were never put in contact with each other, either directly or indirectly through their own clearing brokers. It is clear that Plaintiff was not merely matching buyers and sellers, but rather was placing itself squarely in the middle of each transaction in order to reap the profits from the spread, i.e., the price difference between the buy and sell sides of the transactions, for its own account. The Court thus has no difficulty discerning from the undisputed facts that Plaintiff was a buyer and seller of securities for its own account as a part of its regular business, and thus was a dealer of securities as defined in the Exchange Act.[25]

---

**21.** The payment for the securities came from Defendant's DTC account, but Defendant did not require Plaintiff to post an equivalent amount of cash or collateral in its in-house account with Defendant. Thus, when Defendant paid for the security, it was extending credit to Plaintiff in violation of Regulation T and Section 7 of the Exchange Act. *See supra* note 15 and accompanying text.

**22.** *See S.E.C. v. Ridenour*, 913 F.2d 515, 516–17 (8th Cir.1990) (holding unregistered broker-dealer who "matched transactions" violated registration requirements of Exchange Act); *LTV Fed. Credit Union v. UMIC Gov't Sec., Inc.*, 523 F.Supp. 819, 834 (N.D.Tex. 1981) (discussing matching sales and purchases).

**23.** Mr. Lampert: So you give—you give up the buyer to the seller?

Mr. Scalzi: Yeah. I don't give up the name, all right? [The counter-party] doesn't know the name of who's buying it, it's go—you know, it's being booked through me.

Mr. Lampert: Right. They know you.

Mr. Scalzi: Right, they know me, as the buyer. Exactly right.

Mr. Lampert: So you're not really brokering it, it's a riskless principal trade, if you will, but technically you're buying it yourself and turning around and selling it.

Mr. Scalzi: Right. Okay, that's correct. Well, I mean, that's the way we work it with everything we do.

**24.** *See* John Polanin, Jr., *The "Finder's" Exception from Federal Broker–Dealer Registration*, 40 Cath. U.L.Rev. 787, 789 (1991) (analyzing the registration requirements of three categories of "finders").

**25.** "The term 'dealer' means any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sells securities for his own account, either individ-

In addition, Plaintiff may have been acting as a broker. A broker is "any person engaged in the business of effecting transactions · in securities for the account of others ...." Exchange Act § 3(a)(4). There is some evidence in the record that Plaintiff submitted trades on behalf of another brokerage firm for clearing to Defendant, which would qualify Plaintiff as a broker. For the purposes of this motion, however, we do not consider the difference to be significant, because both brokers and dealers are subject to the registration requirements of the Exchange Act and CUSA.

### B. Registration Requirements

Plaintiff argues that it was not required to register with the SEC since much of its business involved transactions in exempted securities.[26] Plaintiff claims that Defendant could have continued clearing its trades in exempted securities while declining to approve trades in non-exempt securities. Although it is clear from the record that Plaintiff was trading in securities which made it subject to the registration requirements of the Exchange Act, including United States government securities and Canadian government securities, Defendant does not assert in its defense Section 29(b) of the Exchange Act, a provision which invalidates contracts made or performed in violation of the Exchange Act.

Defendant does assert CUSA's analogous provision in its defense, alleging that Plaintiff was required to register pursuant to the Connecticut Uniform Securities Act ("CUSA"), Conn. Gen.Stat. § 36b–6(a), regardless of the type of security it traded.[27] Nonetheless, we find that both statutes apply to Plaintiff's trading activity. Therefore, we will analyze Defendant's claims under both the federal and state statutes.

The Exchange Act requires registration of brokers and dealers unless their business is exclusively intrastate and they do not make use of any facility of a national securities exchange to effect transactions, or unless they trade exclusively in exempted securities, commercial paper, bankers' acceptances, or commercial bills. Exchange Act § 15(a)(1). CUSA, however, requires *all* persons transacting business as broker-dealers in the State of Connecticut to register with the State's Commissioner of Banking. CUSA does not excuse broker-dealers who trade exclusively exempted securities from its registration requirement. Even if Plaintiff had traded exclusively commercial paper, bankers' acceptances, and/or commercial bills, and could lawfully have avoided the federal registration requirements, it would still have been required to register under CUSA. We reject Plaintiff's

---

ually or in some fiduciary capacity, but not as a part of a regular business." Exchange Act § 3(a)(5).

**26.** The Exchange Act requires registration of brokers and dealers who trade in securities "other than an exempted security or commercial paper, bankers' acceptances, or commercial bills ...." Exchange Act § 15(a)(1). Exempted securities include, *inter alia,* United States government securities and municipal securities. *Id.* § 3(a)(12)(A). Dealers in municipal securities are required to register pursuant to § 15B(a)(1), and government securities brokers or dealers are required to register pursuant to § 15C(a)(1)(A) of the Exchange Act. Thus, only a broker and/or dealer trading exclusively in commercial paper, banker's acceptances, or commercial bills (or, of course, any instrument not qualifying as a security

under the Exchange Act, *viz.,* "currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited" Exchange Act § 3(a)(10)) could lawfully avoid the registration requirements of the Exchange Act.

**27.** "No person shall transact business in this state as a broker-dealer unless he is registered under sections 36b–2 to 36b–33, inclusive...." Conn. Gen.Stat. § 36b–6(a). "'Broker-dealer' means any person engaged in the business of effecting transactions in securities for the account of others or for his own account...." Conn. Gen.Stat. § 36b–3(3).

argument that it could have continued trading exclusively in certain types of securities without violating CUSA. Plaintiff's transaction of business as an unregistered broker-dealer in the State of Connecticut violated both the federal and CUSA's registration requirement.

## C. Validity of Contracts Provisions

### 1. Section 29(b) of the Exchange Act

We turn our attention next to the Exchange Act's provision on the validity of contracts. Section 29(b) provides that "[e]very contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract ... made there performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void ...." (setting forth certain exceptions not relevant here). The issue before the Court is whether the clearing agreement was such a contract, made in violation of or the performance of which involved the violation of any provision of the Exchange Act.

■ The clearing agreement and the principal letters required Defendant to stand in Plaintiff's stead in order to carry out transactions which Plaintiff had done unlawfully. The clearing agreement was thus inextricably intertwined with the violations of the Act. Without deciding whether Defendant committed a primary or secondary violation of the Exchange Act, an issue not before us, we hold that performance of the clearing agreement involved violations of the Act and therefore is void pursuant to Section 29(b).

There is little relevant case law discussing Section 29(b) in the context of clearing agreements, and none that we have found in which an unregistered broker/dealer seeks to enforce a clearing agreement. We are guided, however, by the Fifth Circuit's analysis of Section 29(b) in *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir.1982). There, the court held that an unregistered broker could not enforce agreements that were "perfectly lawful on their face," reasoning that the performance of the unregistered broker resulted in a violation of the Act. The court pointed out that "Section 29(b) does not render void only those contracts that 'by their terms' violate the Act." *Id.* at 559. The court continued, "That these contracts, under different circumstances, could have been performed without violating the Act is immaterial." *Id.* at 560. *See also Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir.), *cert. denied*, 393 U.S.913, 89 S.Ct. 234, 21 L.Ed.2d 198 (1968) (contract void pursuant to § 29(b) because purchaser was unregistered broker-dealer). The court set forth three elements of a Section 29(b) cause of action: (1) contractual privity; (2) the contract involved a "prohibited transaction"; and (3) the party seeking to avoid the contract must be in the "class of persons the Act was designed to protect." *Regional Properties,* 678 F.2d at 559. In that case, as here, the first element, contractual privity, was not in dispute. In analyzing the second element, the court held that prohibited transactions included transactions by an unregistered broker-dealer. *Id.* at 560. In determining the third element, the scope of the class entitled to the Act's protections, the court relied on the clear language of Section 29(b) that renders void "[e]very contract made in violation of any provision of this title." The court offered a broad interpretation of the Exchange Act's purpose of protecting the national public interest, holding that the plaintiff in that case, a partnership that was neither an issuer nor an investor, was within the class of persons the Act was designed to protect. *Id.* at 561–62.

Applying the second element, we find that Plaintiff's trades were prohibited transactions, and that the clearing agreement involved Defendant's performance, as Plaintiff's clearing agent, of those prohibited transactions. The clearing agreement

was inextricably intertwined with Plaintiff's unlawful trades, because it required Defendant to carry out the transactions which Plaintiff had done unlawfully. Thus, the second element is satisfied.

The final element, proof that the Defendant is a member of the class of persons the Act was designed to protect, is similarly satisfied. Defendant, a registered broker-dealer, is a member of the securities industry which the Act was designed to regulate and control. We see no reason to limit the Act's protections to only issuers and investors and to withhold its protections from duly registered members of the securities industry. Thus, we hold that Defendant is among those the Act was designed to protect and that the final element necessary to invoke Section 29(b) is satisfied.

Defendant has therefore satisfied all the elements necessary to set forth its defense under Section 29(b). Because Plaintiff has failed to carry its burden to show the existence of any genuine issues of material fact, and because the record is sufficient to show that Plaintiff engaged in the purchase and sale of securities for its own account as a part of a regular business as an unregistered broker-dealer, in violation of Section 15(a)(1) of the Exchange Act, and because the clearing agreement was inextricably intertwined with Plaintiff's unlawful transactions, the clearing agreement is void and unenforceable.

*2. Section 36b–29(h) of CUSA*

■ We consider next Defendant's assertion that Section 36b–29(h) of CUSA prohibits Plaintiff from basing any cause of action on the clearing agreement. Section 36b–29(h) provides that "No person who has made or engaged in the performance of any contract in violation of any provision of [CUSA] . . . may base any cause of

action on the contract." Analogous to the claim under Section 29(b) of the Exchange Act, Defendant argues that Plaintiff's transaction of business in the State of Connecticut as a broker-dealer without having first registered with the State Commissioner of Banking violated the registration requirement set forth in Section 36b–6(a) of CUSA.[28] Defendant further argues that the clearing agreement was a contract which involved performance in violation of CUSA, because it required Defendant to process trades made in violation of CUSA.

■ The analysis of this claim is analogous to the Section 29(b) analysis set out previously. The well-established rule is that "if the purpose of a licensing statute is the regulation of the business licensed and not merely the collection of revenue, a person not licensed cannot enforce a contract for services rendered within the scope of the regulated business." *Solomon v. Gilmore*, 248 Conn. 769, 792, 731 A.2d 280, 293 (1999) (holding secondary mortgage issued by unlicensed lender unenforceable on public policy grounds); *see also* 2 Restatement (Second) of Contracts § 181 (1981). Moreover, the Connecticut Supreme Court has held that "the remedial purpose of CUSA supports the conclusion that the scope of Section 36–498(g) [now Section 36b–29(h) ] encompasses not only a contract illegal on its face, but also extends to the basic transaction underlying the contract." *Connecticut Nat'l Bank v. Giacomi*, 242 Conn. 17, 66–67, 699 A.2d 101, 128 (1997) (holding that bank was precluded by § 36–498(g) [now § 36b–29(h)] from enforcing promissory notes when bank's CUSA violations were "inextricably intertwined" with investors' execution of the promissory notes).

Plaintiff argues that Section 36b–29 of CUSA applies only to persons who sell or offer to sell securities in the State of Con-

---

**28.** Section 36b–6(a) of CUSA provides:
No person shall transact business in this state as a broker-dealer unless he is registered under sections 36b–2 to 36b–33, inclusive. No individual shall transact business as an agent in this state unless he is registered as an agent of the broker-dealer or issuer whom he represents in transaction such business.

necticut, pursuant to Section 36b–33(a). That is so. The Court has previously determined that Plaintiff was a buyer and seller of securities, therefore, Section 36b–29(h) is applicable to Plaintiff, prohibiting it from basing any cause of action on the clearing agreement, which would necessarily entail violations of CUSA due to Plaintiff's failure to register in the State.

### 3. Common Law

■ Finally, we consider common law provisions voiding illegal contracts. "Contracts which are opposed to open, upright, and fair dealing are opposed to public policy." *Smith v. David B. Crockett Co.*, 85 Conn. 282, 287, 82 A. 569, 571 (1912); *see also* 2 Restatement (Second) of Contracts § 181 ("If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if (a) the requirement has a regulatory purpose, and (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement."). Agreements made in violation of public policy have been deemed "unenforceable" and "void." *Blancato v. Feldspar Corp.*, 203 Conn. 34, 40, 522 A.2d 1235, 1238 (1987).

■ It is clear in this case that the federal and state registration requirements have a regulatory purpose. Furthermore, the Court finds that the public policies behind the federal and state securities laws outweigh any interest the violator may have in enforcing the contract. Therefore, we find as a matter of law that the contract violated public policy and is unenforceable.

### 4. In Pari Delicto Doctrine

■ A contract violating Section 29(b) is "voidable at the option of the innocent party." *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 387, 90 S.Ct. 616, 623, 24 L.Ed.2d 593, 604 (1970). However, the defense of *in pari delicto* is a valid defense in a private action for violation of the Exchange Act. *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F.Supp. 286, 289 (D.Conn.1979). As a general rule, a "court will not lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law… but if both parties are *in pari delicto* [i.e., in equal fault], the law will leave them where it finds them." *Dowling v. Slotnik*, 244 Conn. 781, 807, 712 A.2d 396, 409 (Conn.1998), *cert. denied sub nom Slotnik v. Considine*, 525 U.S. 1017, 119 S.Ct. 542, 142 L.Ed.2d 451 (1998). "It is in order to effectuate an underlying public policy, rather than to sanction a party seeking to enforce an 'illegal' contract, that courts refuse to lend assistance to those who have contributed to the illegality that taints the contract." *Id.* at 808, 712 A.2d 396, 712 A.2d at 410. The application of the *in pari delicto* doctrine rests upon the sound discretion of the court. *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F.Supp. 286, 289 (D.Conn. 1979). Plaintiff, having violated both the federal and state securities law, is not an innocent party. Although we assume for purposes of this motion that Defendant was aware that Plaintiff was an unregistered broker-dealer, we need not decide whether Defendant is an innocent party, since, even if Defendant was innocent, it seeks to avoid the contract, not to enforce it. Thus, the outcome would be the same whether or not we apply the *in pari delicto* doctrine. The Court will not lend its assistance in enforcing the clearing agreement.

■ Plaintiff argues that Defendant had alternatives to terminating the clearing agreement entirely, including permitting it to trade exempt securities, or suspending clearing temporarily to give Plaintiff time to become registered or to find another clearing broker. In that manner, Plaintiff urges, it could have continued doing business without the onerous margin requirements. Plaintiff essentially

argues that it should have been granted the opportunity to correct its violations within the ninety day notice period. We disagree.

Plaintiff could not lawfully trade any type of securities in the State of Connecticut without first registering with the State's Department of Banking. Furthermore, giving effect to the notice provision would effectively enforce the contract at the violator's option. The option to avoid the contract belongs to the non-violator, if there is one, not to the violator. Plaintiff, having violated the federal and state statutes, does not have the right to enforce the clearing agreement. Thus, the contract and the notice provision are unenforceable.

Having determined that there are no genuine issues of material fact and that the clearing agreement is unenforceable due to Plaintiff's violations of the federal and state securities laws, the Court GRANTS summary judgment in favor of Defendant as to the breach of contract claim.

## II. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges in Count Two of the Complaint that Defendant breached the implied covenant of good faith and fair dealing inherent in every contract. The Connecticut courts have recognized that the implied covenant of good faith and fair dealing requires that "neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon*, 224 Conn. 231, 238, 618 A.2d 501, 505 (1992). Plaintiffs have failed to set forth any facts showing that Defendant committed any acts that injured Plaintiff's right to receive the benefits of the agreement. Furthermore, we have determined that the contract is void and unenforceable due to Plaintiffs' failure to register pursuant to federal and state securities laws. The Court GRANTS summary judgment in favor of Defendant as to Count Two.

## III. Misrepresentation Claim

Plaintiff alleges in Count Three of the Complaint that Defendant falsely represented to it that it would not terminate the clearing agreement without ninety days notice. "A promise to do an act in the future when coupled with a present intention not to fulfill it, is a false representation." *Meyers v. Cornwell Quality Tools, Inc.*, 41 Conn.App. 19, 28–29, 674 A.2d 444 (1996). The fact that Defendant later refused to continue clearing Plaintiffs' trades after the Connecticut State Department of Banking investigator brought Plaintiffs' securities laws violations to Defendant's attention has no bearing on Defendant's intention to fulfill the contract at the time of its making. After a thorough review of the record, the Court finds that Plaintiff has set forth no facts from which the Court could infer that Defendant had a present intention at the time of the making of the clearing agreement not to fulfill any promise to give ninety days notice prior to terminating the clearing agreement. The Court GRANTS summary judgment in favor of the Defendant as to this Count.

## IV. Connecticut Unfair Trade Practices Act Claim

Plaintiff alleges a claim under CUTPA, Conn. Gen.Stat. §§ 42–110a–q, in Count Four of the Complaint, seeking redress for Defendant's "unfair, unscrupulous, and unnecessary actions that destroyed [Plaintiff's] business, including terminating [Plaintiff's] account without notice, while providing all other clearing clients at least 60 days notice before closing their accounts." (Pl.'s Opp'n Mem. at 36.) Defendant argues that securities transactions are not subject to CUTPA, and that a breach of contract alone is not sufficient to establish a violation of CUTPA.

CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

commerce." Conn. Gen.Stat. § 42–110b(a). The Connecticut Supreme Court has adopted the criteria set out in the so-called "cigarette rule," promulgated by the Federal Trade Commission to determine whether a practice is unfair or deceptive. *See Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). The cigarette rule's three criteria are:

> (1) whether the practice, without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory or other established conduct of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors, or other businessmen) ].

*Id.; see also McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 473 A.2d 1185 (1984). All three criteria need not be satisfied. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Willow Springs Condominium Ass'n, Inc. v. Seventh BRT Dev. Corp.*, 245 Conn. 1, 43, 717 A.2d 77, 99–100 (1998).

The Connecticut Supreme Court has held in that securities transactions are exempt from CUTPA because they are comprehensively regulated by the SEC and because the FTC does not regulate securities transactions. *See Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 179–80, 510 A.2d 972, 976–77 (1986).

■ Moreover, we have already dismissed Plaintiff's breach of contract claim due to the invalidity of the contract, finding as a matter of law that Plaintiff violated federal and state securities laws. No reasonable juror could find that Defendant's refusal to continue clearing Plaintiff's trades in violation of the securities laws offended public policy, was unfair,

immoral, unethical, oppressive or unscrupulous, or caused injury to consumers.

We therefore GRANT Defendant's motion for summary judgment on this Count.

## V. *Tortious Interference with Business Relations Claims*

Plaintiffs CBI and Scalzi set forth claims in Counts Five and Six, respectively, alleging tortious interference with business relations. CBI's claim relate to alleged interference with its clients, while Scalzi's claim relates to alleged interference with his relationship with CBI. Plaintiffs claim that Defendant's abrupt cancellation of the principal letters implied some impropriety on their part that made it impossible for CBI to continue doing business with its former clients and for Scalzi to continue his relationship with CBI.

■ The Connecticut courts have long recognized a cause of action for tortious interference with contract rights or other business relations. *Blake v. Levy*, 191 Conn. 257, 260, 464 A.2d 52 (1983). A plaintiff must prove that the defendant's conduct was in fact tortious, by showing that the defendant was, for example, guilty of fraud, misrepresentation, intimidation, molestation, or that the defendant acted maliciously. *Id.* at 261, 464 A.2d 52. Malice on the part of the defendant can be shown by demonstrating "intentional interference without justification." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 806, 734 A.2d 112, 135 (1999) (citing 4 Restatement (Second) of Torts § 766 cmts. (1979)). "An action for tortious interference with business relations ... requires the plaintiff to plead and prove at least some improper motive or improper means." *Id.*

■ We no find no implication of impropriety on Plaintiffs' part either in the language of the cancellation letters themselves, or in the fact that Defendant canceled all the outstanding principal letters concurrently, although we note that there would have a basis for such an implication

in light of Plaintiffs' violation of the securities laws by the failure to register. According to the plain language of the principal letters themselves, Defendant was entitled to cancel the principal letters upon written notice to the other parties, and Plaintiffs do not allege that Defendant agreed to any prior notice period with respect to the principal letters. Plaintiffs have failed to proffer any evidence that would permit an inference that Defendant acted maliciously or with improper motive or improper means. Furthermore, it is clear that Defendant acted with justification when it refused to perform, knowing that Plaintiffs were violating the securities laws. Therefore, we find that Plaintiffs have set forth no facts in support of this claim, with respect either to Plaintiff CBI's claim in Count Five or Plaintiff Scalzi's claim in Count Six. The Court therefore GRANTS summary judgment in favor of Defendant as to Counts Five and Six of the Complaint.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment [Doc. No. 31] as to all Counts of Plaintiffs' Complaint. The Clerk is directed to enter Judgment accordingly and to close this file.

**SO ORDERED.**